Sosman, J.
The Cadle Company (“Cadle”) brought the present action seeking to collect the deficiency on a promissory note after repossession and sale of a portion of the collateral and seeking a court order to allow it to take possession of the remaining collateral. Defendant Robert Zottoli contends that Cadle failed to follow proper procedures in repossessing the collateral and that those failures preclude Cadle from collecting any deficiency. Zottoli has also brought counterclaims for trespass, conversion and violation of G.L.c. 93A stemming from the allegedly improper repossession methods used by Cadle. After trial without jury, the court renders its findings and rulings as follows.
Findings of Fact
Defendant Robert Zottoli is a professor of Biology at Fitchburg State College. He resides at 500 Ashburnham Hill Road in Fitchburg with his wife and three children. In November 1987, Zottoli purchased a 1986 Audi from one William Webster, the President of First Service Bank. To assist one of its officers in the transaction, First Service Bank agreed to finance Zottoli’s purchase of the vehicle.
On November 27, 1987, Zottoli executed a promissory note in favor of First Service Bank, secured by both the Audi he was purchasing and by another vehicle he owned,.a 1979 Chevrolet Corvette. The note was to be paid over five years, with monthly installments of $317.25 and a final “balloon" payment of $13,187.86. In the event of default, the Bank could declare the entire amount owed due and payable. The Bank would also be entitled to recover the costs of collection, including attorneys fees. Along with the Note, Zottoli also executed a Security Agreement covering both vehicles.
First Service Bank ultimately failed and was taken over by the FDIC. The FDIC instructed Zottoli to make his payments to the FDIC, which he did. However, by March 1990, Zottoli was three months in arrears on his payments. On March 4, 1990, the FDIC sentZottoli a notice of default containing the legend, “RIGHTS OF DEFAULTING BUYER UNDER THE MASSACHU *9 SETTS MOTOR VEHICLE INSTALMENT SALES ACT.” The notice demanded payment of $951.00 by March 26, 1990 in order to cure the default. The notice further warned that if the payment was not made by March 26, the FDIC could sue for the full amount owed and take possession of the collateral. The notice also advised Zottoli that, in the event the collateral was repossessed, he would have the right to get it back by paying the debt in full, plus expenses, within twenty-one days of the repossession. Zottoli made some further payment, and the FDIC did not follow through on any collection action or repossession at that time.
In May 1992, the FDIC .sold the Zottoli note to plaintiff Cadle, an Ohio corporation with offices in Newton Falls, Ohio.[1] At that point, the outstanding balance on the note was approximately $20,000. On May 27, 1992, Cadle sent Zottoli a letter notifying him that Cadle had acquired the note and requesting that Zottoli contact them “so that we can make progress toward liquidating your debt.” On June 8, the president of Cadle called Zottoli to discuss the status of his loan. Zottoli acknowledged that he was many months in arrears on his payments and asked for a reduction in payments based on an alleged inability to pay. However, when Cadle asked Zottoli for basic information with which to corroborate his claimed inability to pay (such as the identification of his employer), Zottoli refused to provide any information.
The next day, June 9, Zottoli wrote to Cadle proposing a payment plan of $200 per month.[2] Zottoli’s letter asserted that his ability to pay was “somewhat limited” because he had not had any pay raise in the last four years. The letter did not disclose either the identity of Zottoli’s employer or provide any numbers as to income or expenses. Zottoli’s letter also stated that his only assets were the two vehicles and a one-half interest in his home, which he said (again without any numbers) was “heavily mortgaged.”
Cadle again called Zottoli after receiving his letter, and again requested information with which to verify his claimed inability to pay the full monthly payments and to support his request for an extension of credit. Zottoli again refused to disclose the identity of his employer and merely reiterated that he had not had a raise. Zottoli then verbally increased his proposal to $250 per month, and told Cadle that if they didn’t accept that they wouldn’t get anything. Cadle advised that, if he refused to cooperate with the verification of his alleged inability to pay, there would be no choice but to call the loan and repossess the vehicles. Zottoli then asserted that they would not be able to repossess, and claimed that a friend of his who was a judge was advising him in this matter.
On June 18, 1992, Cadle again wrote to Zottoli, rejecting his proposed $250 per month payment plan. Cadle’s letter pointed out to Zottoli that his refusal to provide basic information about his situation made it impossible to proceed with loan workout discussions. The letter notified Zottoli that Cadle was accelerating the loan due to its “serious default” and Zottoli’s “uncooperative attitude” and demanded immediate payment of the entire $20,951.28 outstanding balance. The letter advised that, if Zottoli did not intend to pay that full amount, he should “assemble the collateral and contact me to make arrangements for the repossession and sale of the collateral.” The letter further advised Zottoli that Cadle would apply the proceeds of the sale of collateral to his outstanding balance and require payment in full on the remaining deficiency.
Zottoli wrote back to Cadle on June 22, 1992. In that letter, he advised that he had been unwilling to provide information “because I didn’t know and am still not sure whether or not you in fact hold my loan.”[3] Zottoli’s letter also protested that he wanted an “accounting” of his loan. He claimed that, since the FDIC’s acquisition of First Service Bank, he had been “unable to find out the status of the loan (how much has been paid and the principal balance).” He claimed that he had requested this information “four times” from the FDIC and had never heard back from them. He also claimed that “according to Massachusetts State Law I am supposed to be officially notified of any default on my loan,” and that “this [official notification of default] has never happened.” Zottoli reiterated his $250 per month proposal and stated that, if that was not acceptable, the matter would have to go to court.
Cadle again wrote to Zottoli on July 21, 1992. With regard to Zottoli’s claimed need for verification of the purchase from the FDIC, Cadle again specified that it had been purchased in the liquidation of First Service Bank. As to an accounting, Cadle reported that the FDIC had certified to them at the time of purchase that the outstanding principal balance was $19,827.68, that the accrued interest through June 20 was $1,123.60, and that the per diem interest was $4.68. The letter advised that Zottoli either pay the loan or arrange a voluntary surrender of the collateral. The letter advised Zottoli that, under the terms of the note, he would be responsible for the costs associated with repossession of the vehicles, that Cadle did not wish to increase the amount owed, but that if Zottoli refused to surrender the collateral they would proceed with repossession and hold him liable for the associated additional costs. The letter closed with the following paragraph:
It is apparent from your telephone conversations and your correspondence that you are looking for a technical mistake on our part which you could use to avoid your responsibilities under the note. It is our desire to follow the spirit and the letter of the law in servicing this account. We are not aware of any obligations which may be unique under the laws of Massachusetts, and therefore we are proceeding accordingly with our intention of repossession.
*10 Sometime after receipt of this letter, Zottoli consulted attorney John Gouzerian with regard to this dispute. Cadle thereafter dealt with Gouzerian seeking to resolve this debt. On October 2, 1992, Cadle spoke with Gouzerian, who requested that Cadle provide him with an accounting on the Zottoli loan. Cadle advised that Zottoli had made no payments whatsoever to Cadle since its acquisition of the note in May 1992.[4] Gouzerian then said that he needed to see all payment records from the previous holders of the note.
On October 6, 1992, Cadle sent Gouzerian a letter enclosing copies of such records and an accounting of his prior payment history. That history revealed that Zottoli had made only thirty-five payments of the scheduled sixty payments and pointed out that, even in the absence of any acceleration, the loan was due in full on November 30, 1992. The letter reiterated Cadle’s concern that Zottoli had been uncooperative in prior attempts to restructure the loan and that Cadle was therefore proceeding with repossession. The letter repeated Cadle’s demand that Zottoli assemble and surrender the collateral and repeated Cadle’s intention to proceed with an adversary repossession if necessary. The letter repeated Cadle’s prior announcement that it would sell the collateral, apply the proceeds, and bring an action to recover the deficiency plus the fees incurred in the repossession. Cadle asked Gouzerian to convince his client to stop “hiding” the collateral, warning that “further attempts to hide the collateral will only result in additional expense to him.”
On November 12, 1992, having received no response from either Zottoli or Gouzerian, Cadle hired National Locators and Investigations (“National”), a repossession company located in Laconia, New Hampshire, to proceed with repossessing and selling Zottoli’s vehicles. Cadle had not used National’s services before, but had acquired National’s name byway of a bank reference. Cadle sent National the note, security agreement, and title documents on the two vehicles. Cadle’s cover letter specifically advised National that Cadle intended to pursue Zottoli for the deficiency and warned, “We must follow whatever procedures are required to preserve our right to sue for the deficiency balance.”
On November 17, 1992, private detective Roger Comins, the principal of National, along with another employee of his company went to the Fitchburg police station and notified the police of their intention to effect a repossession of the Zottoli vehicles. They left with the police copies of the necessary documentation. In the mid-afternoon, Comins and his associate went to the Zottoli residence on 500 Ashburnham Hill Road and pulled into the driveway. They told the Zottoli’s daughter and a babysitter that they were looking for the McCarthy’s at 501 Ashburnham Hill Road. The Zottoli’s daughter told them that they had the address wrong, and suggested they try another street. The two men left.
Zottoli’s wife returned home shortly thereafter. The Audi was parked in the garage. At around 4:15 p.m., Comins and his associate returned. The babysitter saw the car, and indicated to Mrs. Zottoli that these two men had been there before that afternoon. Comins came to the door and entered the house.[5] Comins again reported that they were lost, and again stated that they were looking for the McCarthy’s at 501 Ashburnham Hill Road. Mrs. Zottoli told Comins that there was no such address and no such people in the neighborhood and asked him to leave and not return. Comins then left.
Sometime between 5:00 p.m. and 6:00 p.m., Comins again returned to the Zottoli residence. When Mrs. Zottoli saw the car pull in and two men get out, she called the police. Comins came to the house while Mrs. Zottoli was on the phone to the police. He told her that he was from a repossession company. Mrs. Zottoli told him to get out. Comins left the house but went to the garage and began pushing the Audi out into the driveway.
Officers Christopher Ledoux and Joel Caddy of the Fitchburg police responded to the scene. Comins and his assistant were still in the process of pushing the Audi out of the garage when the police arrived. Officer Ledoux checked Comins’ identification and called the station to confirm that the appropriate papers were on file. After ascertaining that everything was in order, Officer Caddy spoke with Mrs. Zottoli and advised her that there would be less damage to the car if she turned over the keys to Comins and avoided the use of a towr truck. On his advice, Mrs. Zottoli turned over the keys. Comins then drove the Audi away.
On December 17, 1992, Cadle wrote to Zottoli advising him that they intended to sell the Audi at a private sale on or after December 28 if he did not pay the full outstanding balance. Cadle itemized that balance as $19,827.68 in principal, $1,966.25 in interest (through December 20), and $600.00 in repossession costs, for a total payoff figure of $22,393.93. The letter also advised Zottoli that, if he did not turn over the other vehicle, Cadle would seek a writ of replevin, with the costs of that replevin action added to Zottoli’s outstanding balance. The letter also advised Zottoli that, after sale of the vehicles, Cadle intended to bring an action to collect the deficiency.
On January 6, 1993, attorney Warren Hurwitz, representing Cadle, sent Zottoli a letter advising him that the note had matured on November 30, 1992 and that he was in default. Under the heading “RIGHTS OF DEFAULTING DEBTOR UNDER MASSACHUSETTS LAW,” Hurwitz itemized Zottoli’s balance for a total of $22,633.49. The letter advised Zottoli that, if he did not make full payment within twenty-one days, Cadle “may sue you to obtain a judgment for the amount of the debt, and/or may take possession of the remaining collateral, namely, your 1979 Chevrolet Corvette.” The letter further advised Zottoli that, if the creditor took possession of the collateral, he would have the right to get it back by paying the full amount of the debt plus *11 expenses within twenty-one days of the date of repossession. The letter also included a notice of rights pursuant to the federal Fair Debt Collection Practices Act.
On January 21, 1993, National had the repossessed Audi appraised at a local Audi dealership. That dealer appraised the vehicle at $1,500. National proceeded to obtain bids on the vehicle, receiving three bids ranging from a low of $1,350 to a high of $1,700. Cadle approved sale to the highest bidder, but that bidder ultimately declined to buy the car. National then offered to buy the car itself for the same $ 1,700. Cadle accepted National’s offer, executed an affidavit releasing its lien, and sent the title to National on February 5, 1993.
The Zottolis pressed criminal charges (trespassing and breaking and entering) against Comins. Comins was found not guilty. As a result of the repossession fees, storage charges, and costs of defending against the criminal action, National has increased its fee to at least $1,700 and has kept the entirety of the $1,700 sale proceeds for itself.
Rulings of Law 1. Cadle’s claim for deficiency on the note (Count III)
Cadle has established execution of the note, default, and the amount of the outstanding balance. Zottoli contends, however, that Cadle violated G.L.c. 255B and that those violations now preclude Cadle from recovering any deficiency.
G.L.c. 255B regulates retail instalment sales of motor vehicles. Zottoli contends that the note and security agreement he signed constitute a retail instalment contract for the sale of a motor vehicle that would be subject to the various requirements set forth in G.L.c. 255B. Cadle contends that the transaction was not a retail instalment contract that would be subject to G.L.c. 255B.
The statute defines “retail instalment contract” as “an agreement, signed by the buyer in this state, pursuant to which the title to, the property in or a lien upon a motor vehicle, which is the subject matter of a retail instalment sale, is retained or taken by a retail seller from a retail buyer as security, in whole or in part, for the buyer’s obligation.” G.L.c. 255B, §1. The term “retail instalment sale” is defined as “a sale of a motor vehicle by a retail seller to a retail buyer for a total sale price payable in two or more instalments, payment of which is secured by a retail instalment contract.” Id. The term “retail seller” is defined as “a person who sells a motor vehicle to a retail buyer under or subject to a retail instalment contract.” Id.
The transaction at issue in the present case was not a “retail instalment sale” of the vehicle previously owned by Mr. Webster. The seller, Webster, did not take payment in “two or more instalments.” He was paid, in full, by the proceeds of the loan from First Service Bank to Zottoli. There was not a retail instalment sale between Webster and Zottoli, let alone one that was later acquired by the bank. Rather, to assist one of its own officers, the bank made a loan directly to Zottoli. Zottoli executed a promissory note and a security agreement, which listed as collateral both the vehicle that Zottoli was purchasing from Webster and the Chevrolet Corvette that he already owned. There was no “retail instalment sale of a motor vehicle” involved, and the transaction was not subject to G.L.c. 255B.
If the note and security agreement were governed by G.L.c. 255B, Zottoli has established that there was a violation of that statute.[6] However, the court would not accept Zottoli’s argument as to the collection consequences of such a violation. Under G.L.c. 255B, §20B (e)(1), “the creditor shall be entitled to recover from the debtor the deficiency, if any, resulting from deducting the fair market value of the collateral from the unpaid balance due and shall also be entitled to any reasonable repossession and storage costs, provided he has complied with all provisions of this section.” Zottoli argues that the proviso requiring compliance with “all the provisions of this section” is a prerequisite to any action on the deficiency. Cadle contends that the proviso limits a creditor’s ability to recover repossession and storage costs.
In the absence of clear legislative directive, the court would not impose the forfeiture Zottoli seeks. See Poti Holding Co. v. Piggott, 15 Mass.App.Ct. 275, 279-80 (1983). Such forfeitures are frowned on, as they may constitute a windfall to the borrower and a penalty on the lender that are way out of proportion to the harm done by any technical misstep in collection proceedings. At best, this particular section of the statute is ambiguous, and the court would not read such a forfeiture/windfall into ambiguous language. A more sensible reading, and a penalty more commensurate with the harm done, would be to hold that a creditor who repossesses and sells a vehicle without meeting all the statutoiy prerequisites must pay all costs associated with that repossession and may not, regardless of contrary language in the note and security agreement, pass on to the borrower the costs of repossession and sale. In resolving the ambiguity, it is also useful to compare the language of §20B (e)(1) with that contained in §22 of the same chapter. Section 22 provides: “A violation of sections nine to fourteen, inclusive, or eighteen to twenty, inclusive, by any person shall bar his recovery of any finance charge, delinquency or collection charge or refinancing charge on the retail instalment contract involved." When the legislature intended a violation to bar any portion of a creditor’s recovery under the contract, it said so explicitly. It also set the consequences of a violation at a level that would still allow the creditor to recover the unpaid principal on the loan, forfeiting only the finance charges. The court would not, from the ambiguous language in §20B(e)(l), conclude that the legislature intended to prevent the creditor from recov *12 ering even the underlying principal balance on the loan merely on account of a technical defect in the notice concerning repossession.[7]
Accordingly, Cadle is entitled to recover the full amount of the deficiency, plus attorneys fees and costs of collection and, since G.L.c. 255B does not apply, the repossession and storage charges. Zottoli will be given credit for the sale proceeds ($1,700), but those proceeds will effectively be offset by the repossession and storage charges. Accordingly, Cadle is entitled to judgment for the unpaid principal balance ($19,827.68), accrued interest at the 8.5% rate set forth in the note ($8,111.09 through the date of this Order), and attorneys fees.[8]
2.Cadle’s claim for injunctive relief (Count I) and replevin (Count II).
Inasmuch as Cadle is entitled to recover the deficiency, Cadle is also entitled to proceed against the remaining collateral. Judgment will enter declaring that Cadle is entitled to repossess and sell Zottoli’s 1979 Chevrolet Corvette and ordering Zottoli to deliver said vehicle to Cadle forthwith.
3.Zottoli’s counterclaim for trespass and conversion (Count I)
Zottoli seeks to recover against Cadle for trespass on his property and conversion of his vehicle. The persons who committed a trespass on Zottoli’s property were the employees of National.[9] National was an independent contractor for purposes of effecting this repossession, not an agent or employee of Cadle. National had been hired by Cadle to repossess the vehicles. The means of performing that contract — when, where, how — had been left entirely up to National. Cadle, an Ohio corporation, had no knowledge of or experience with the technical requirements for repossession in Massachusetts. It hired National, with its ostensible expertise in such matters, to repossess the cars and sell them. Furthermore, Cadle expressly advised National to see to it that all requirements were properly met, as Cadle made clear that it did wish to pursue Zottoli for the deficiency. Cadle did not control or even maintain the ability to control the means and methods of National’s performance. “Generally, an employer of an independent contractor is not liable for harm caused to another by an act or omission of the contractor or his employees.” Vertentes v. Barletta Co., 392 Mass. 165, 168 (1984). While the court does not condone the methods employed by National, there is no basis for making Cadle liable for the torts of its independent contractor.
Zottoli’s alternative theory of conversion fares no better. With regard to any “conversion” perpetrated by Comins in driving the Audi away from Zottoli’s home, Cadle would again not be liable for the torts of its independent contractor.
However, National was not an independent contractor with regard to the later sale of the vehicle. The decision to sell, to whom, at what price, and on what terms was all controlled by Cadle, not National. In selling the vehicle and transferring title, Cadle itself was intentionally exercising control and dominion over the car. However, to make out the tort of conversion, Zottoli would also have to show that Cadle’s exercise of control and dominion was wrongful and that Zottoli had the right to possession of the car. Zottoli’s arguments that the sale was wrongful are merely a repetition of his prior arguments about G.L.c. 255B, §§20A and 20B.[10] Inasmuch as that statute did not apply to this transaction, failure to comply with it does not make the foreclosure sale “wrongful.” Nor has Zottoli shown that he had a right to possession of the vehicle. Cadle had a valid lien on the vehicle, the loan was in default, and Cadle was entitled to repossess and sell the car. Again, Zottoli has not demonstrated that there was any further procedural requirement that would have delayed or prevented Cadle from proceeding with that foreclosure sale. He has therefore not made out the necessary elements of a claim for conversion.[11]
4.Zottoli’s counterclaim for violation of G.L.c. 93A (Count II)
Zottoli’s claim for unfair and deceptive trade practices is again premised on his allegation that Cadle violated G.L.c. 255B, §§20A and 20B and on his allegation of trespass. Where G.L.c. 255B is not applicable, failure to comply with it can not form the basis of any G.L.c. 93A claim. As to the trespass, for the reasons stated above, Cadle can not be held liable for the wrongdoing of its independent contractor.
The court also rules that, on this record, it finds nothing unfair or deceptive in Cadle’s conduct. With the maturity date on the note rapidly approaching, and payments already seriously in arrears, Cadle extended to Zottoli repeated opportunities to negotiate a workout plan. Its insistence that Zottoli provide basic information so that his alleged inability to pay could be verified was eminently reasonable. With regard to the repossession and foreclosure, Zottoli was repeatedly given the substance of the information that consumer protection statutes normally require — i.e., the amount by which he was in arrears, time in which to pay it, warning that acceleration and foreclosure remedies would be invoked, warning that the costs of repossession would be passed on to him, and warning that he would be liable for the deficiency. Moreover, this information was given to Zottoli starting in June 1992, and repeated during the summer, over the course of many months prior to a November 1992 repossession and a Februaiy 1993 sale. For much of that time, Zottoli was represented by counsel, to whom Cadle also communicated its intention to repossess, sell, and seek collection of the deficiency. Zottoli’s counsel actually knew the technical requirements for repossession and foreclosure better than Cadle did. Zottoli has not demonstrated any violation of a statute or regulation committed by Cadle, and he has not shown anything in Cadle’s handling of his loan default that was unfair or deceptive.
*13 5. Zottoli’s counterclaim for filing of a frivolous claim (Count III) ■
Zottoli’s counterclaim also included a separate “Count” under G.L.c. 231, §6F. Where Cadle has prevailed in this action, Zottoli’s request for fees and costs under G.L.c. 231, §6F is denied.
ORDER
For the foregoing reasons, it is hereby ORDERED that judgment be entered as follows:
a) On Count I of plaintiffs complaint, judgment for plaintiff declaring that The Cadle Company is entitled to repossess defendant’s 1979 Chevrolet Corvette, Vehicle ID No. 1Z8789S446195;
b) On Count II of plaintiffs complaint, judgment for plaintiff ordering defendant Robert Zottoli to deliver said 1979 Chevrolet Corvette forthwith to The Cadle Company;
c) On Count III of plaintiffs complaint, judgment in favor of plaintiff in the amount of $27,938.77 plus attorneys fees and costs in an amount to be determined; and
d) On defendant’s counterclaim, judgment in favor of plaintiff/defendant-in-counterclaim The Cadle Company on all counts.

 Zottoli testified that he thought the FDIC had sold the note to Worcester North Bank, that it had then gone to Peoples Bank, that he had made some payments to those banks, and that the FDIC had then reacquired the note when People’s Bank itself failed. The original note does not show any assignment to Worcester North Bank or to Peoples Bank, and the FDIC’s assignment to Cadle identifies that the FDIC was making the assignment in its capacity as receiver and liquidating agent for First Service Bank.

 The letter said nothing about the final balloon payment that would be due by the end of November 1992. Zottoli’s proposal was presumably that he would pay $200 per month until the entire $20,000 balance was paid off.

 At trial, Zottoli also testified that his unwillingness to provide Cadle with information stemmed from this uncertainly as to whether Cadle in fact held his note. The court does not credit this testimony. Zottoli was willing to negotiate with Cadle and had made them two proposals for an amended payment plan. If he in fact entertained any doubt as to whether Cadle had purchased the note from the FDIC, he would not have been making offers to Cadle. He had received written notice from Cadle of its acquisition of the loan, including identification of the failed bank, its FDIC number, and the FDIC’s asset number for his loan. That had been sufficient for Zottoli to negotiate with Cadle, as he proceeded to do. The court infers that Zottoli raised the issue of “verification” of the purchase from the FDIC as a delaying tactic in the negotiations.

 At trial, Zottoli acknowledged that he had never made any payments to Cadle and that he had stopped making payments to the FDIC sometime prior to Cadle’s acquisition of the note.

 At trial, Mrs. Zottoli testified that Comins had come into the house without knocking. According to Ms. Pierce, the babysitter, she was on her way out and already had her hand on the inside door knob when it opened. On this record, the court can not determine whether Comins pushed open the door without knocking or whether he was simply at the door at the precise moment the babysitter happened to leave.

 Although the substance of what must be communicated to a buyer in default under §20A had been communicated at various times to Zottoli, there was no notice meeting, in one document and with the appropriate heading, all of the requirements of §20A prior to the repossession. A notice satisfying those requirements had been sent to Zottoli by the FDIC back in 1990, but that notice would not suffice for Cadle’s November 1992 repossession, as it was by then way out of date. Cadle also would have violated §20B(a), as it repossessed the Audi without a prior hearing, yet effected the repossession by way of National entering onto Zottoli’s property without his consent. G.L.c. 255B was the only consumer credit statute relied upon by Zottoli in his defense of this action. As such, the court has not analyzed the transaction under the definitions of any other statute designed for the protection of consumer borrowers, and the court expresses no opinion as to whether any other such statute was violated in the repossession of Zottoli’s vehicle.

 Zottoli points to the opinion of one commentator who argues that, although ambiguous, the statute should be read as barring the entire deficiency. Queenan, The New Consumer Repossession Law, 58 Mass. L.Q. 412, 417-18 (1973). Judge Queenan’s interpretation was based on the placement of the comma prior to the proviso requiring compliance. (Judge Queenan also observed that the reference to “this section” made it unclear whether both the §20A notice requirements and the §20B repossession requirements had to be met in order to proceed with the deficiency action.) Nowhere in his discussion did Judge Queenan compare this ambiguous language to the explicit provisions in §22. The court respectfully disagrees with Judge Queenan’s interpretation of admittedly ambiguous language containing “inexplicable lapse[s] in draftsmanship.” Id. at 418.

 Cadle is to file an affidavit setting forth its attorneys fees and costs. Zottoli shall file its objections, if any, to Cadle’s requested fees and costs within 21 days after receipt of Cadle’s submission.

 Comins had been told expressly not to return to the Zottoli house. His return later that evening and his intentional entry onto the property would constitute a trespass, as would his remaining on the property after Mrs. Zottoli again instructed him to leave.

 Again, Zottoli has not directed the court’s attention to any other statute that might govern the repossession and foreclosure sale of his vehicle, and the court therefore does not address the question of whether some other statute or regulation was violated by Cadle in this transaction. On his counterclaim, it is Zottoli’s burden to prove that the exercise of control and dominion over the vehicle was “wrongful.” It is therefore his burden to articulate what prerequisites to repossession and sale were not met. The only prerequisites identified by Zottoli were those set forth in G.L.c. 255B, §§20A and 20B, which the court has determined were not applicable.

 Even if Zottoli could establish a conversion, he would not be entitled to more than nominal damages. Normally, the damages for conversion would be the fair market value of the property that had been converted. The car was still subject to Cadle’s lien, and the dollar amount of that lien was far greater than the value of the car. The fair market value of the car, with its lien, was zero. Moreover, when Cadle sold it (at a price that Zottoli does not contest), Zottoli received the benefit of that sale as the amount was credited to Zottoli’s outstanding balance. That that credit was ultimately offset by all the costs of repossession (incurred on account of Zottoli’s refusal to surrender the collateral) does not change the fact that Zottoli has already been credited with the $1,700 proceeds of the sale. He cannot recover those $ 1,700 twice as damages for an alleged conversion.